Okay, the next case is number 20, 2182 Jones against the United States. Mr. Rasmussen. Good morning. May it please the court. The issue in this case, or the issues in this case, are really related to the mandate rule, first of all, and then the scope of the spoliation. So those are the three primary issues we're going to be talking about. With regard to the evidence in this case, the idioms in this, in our own language are really, I think, pertinent here. We talk about a smoking gun as the pinnacle of evidence, and here we had, allegedly, two smoking guns. The United States didn't, collected one of them and then destroyed it after it knew about litigation. Collected it and destroyed it. The other one it didn't even collect. We also talk about somebody being caught red-handed. The United States didn't test Mr. Murray's hand to determine whether it had blood on it, didn't test Officer Norton's hand to determine whether it had blood on it, didn't test his clothing to determine whether it had blood on it. Those would then be pieces of evidence that would have told us what happened on April 1st of 2007. Even if we accept your proposition that the criminal due process standards are not the appropriate things we should be looking at when we're talking about a civil lawsuit, at some point in any civil lawsuit, in order to have spoliation, you have to have anticipation of a civil litigation. So at what point would the government, should the government have anticipated or reasonably anticipated a civil litigation? April 1st of 2007. I think that's what, with Judge Campbell in her prior decision in this case said, yeah, of course we knew, we reasonably anticipated litigation here. This was an officer, a state officer who had come 25 miles into the reservation without jurisdictional authority. There is a well-known history of these types of disputes going to court. And we have an officer who is the only living witness to what happened here. And so yes, there should have been an anticipation of litigation at that point in time. Okay, so as of the events happening? Yes. Okay. So at what stage in the proceedings was the gun destroyed? How much time passed from the initial event to the decision in the actual destruction? I think it was the same year, so I think it was December of 2007. I might be wrong. It was at least that long. One of the things that we did in this case, and one of the significant things that happened is we had the officer, the FBI officer, say I didn't anticipate litigation. He came and testified to that. But we found the needle in the haystack here. We found a piece of paper that showed that he did know about it, and it's page 362 in the appendix. And in that document he says, there's this case going on, and so I'm going to turn the bullet casings over to the Vernal Police Department. But then he doesn't do that with the gun, and that's why we ended up with the spoliation order with regard to the gun, is we found that needle in the haystack that says, I did know about it. So there was, by that point, when that gun was destroyed, there was no question the United States knew about the litigation. No question it knew that the evidence should be preserved. It preserved part of it, and then it destroyed the gun. So, you know, you argue that the spoliation sanction should have been, you know, should have gone all the way, and basically should have said, we enter judgment in favor of the Murray family. But, and in this case, the spoliation sanction was simply that the government couldn't use the gun, which doesn't seem like much of a sanction to me. But there are middle grounds, right? I mean, wouldn't maybe an appropriate sanction be the typical default, which is negative inference against the government? Well, I don't know what the Court of Federal Claims meant when it said the government couldn't rely on the gun or evidence from the gun. Because as I see it, I don't know how you prove your case without the gun. You've got, if you don't have the gun, what you've got is the officer saying, well, he shot himself with a gun, and we don't have a gun. So I didn't understand what exactly that level of sanction was. My view of it was that it was more substantial than this when it says you can't use the evidence from the gun. Can I just ask, I thought there was material in the record, maybe from Mr. Pitzer, is that his name? I forget. That says when you have a jammed casing that is associated with a suicide because the hand holding the gun goes limp, and the casing force is not going to met with any resistance to push the casing out of the chamber. Because the whole gun in the hand is moving back, and that that was actually a significant piece of evidence for the suicide conclusion, and that's what the sanction precluded the government from asserting. The sanction certainly precluded the government from using that. One of the other pieces of evidence that should have been excluded would have been anything related to the testing of that gun. One of the significant pieces of evidence, the two most significant pieces of evidence would have been which of these guns had blood on it. Probably, most likely, much more probable than not, the gun that caused the fatal shot had blood on it. It had aerated blood droplets on it. So we don't have the testing of the gun, either gun, to see whether they had blood on the guns. That was the basic evidence that really should have been collected. So if we're talking about the United States had the gun and didn't test the gun, as we say in our brief, the sanction order with regard to the gun itself, which the United States did know about when it destroyed the gun, the sanction order didn't go far enough because it didn't talk about that evidence. Just to be clear, my understanding is the government destroyed the gun in December 2008. The event was April 1st, 2007, so a year and a half or so later. Did Judge Hertling make a finding about when the United States should reasonably have anticipated litigation? I don't know that he did make a finding. I don't recall a specific finding from him on when the government should have reasonably anticipated litigation. That kind of goes into the next issue, which is he made this decision based upon this other legal basis that isn't really part of spoliation, which is saying the government doesn't have a duty to collect any evidence, that everything there is discretionary. That's not our interpretation of either the due process case law or the spoliation case law. I agree with you, Your Honor. Yes, I think that there were a couple of different significant dates that it could have been. So that's where, when the gun was destroyed, we know the United States knew about the litigation and destroyed the gun anyway, and destroyed with it any evidence of whether that gun had blood on it. At what point was the body no longer accessible to the government? Well, I would say that the body was no longer accessible at the time that it was buried. Which was when? About two days later, I believe. Three days later, maybe. The body was transported to Utah, Salt Lake City, the day after the shooting. The government had ordered an autopsy and then didn't have one conducted. The main piece of evidence that would have come from the body was, did Mr. Murray's left hand have aerated blood on it? That's the main piece of evidence that would have come from that body. If it did, that would have been some evidence in favor of the United States. If it didn't, that would be substantial evidence in favor of the Murray family. Because, again, much more probably than not, if he had put a gun to his head and shot himself, there would be aerated blood on that gun. Or on his hand, iron on the gun. And there would be potentially tissue and other matter. So you could test that and say, oh, okay, it did have this or it didn't have this. That wasn't done. That's something that the body was within the United States' control. So was the government, and I'll ask the government as well, what was their explanation for why they destroyed the gun but preserved the shell casings? They didn't offer an explanation for that. Their explanation was actually the FBI officer testifying that he didn't know at that time. So we had proven that he had actually misspoken under oath about that issue. Because we have his later document where it is shown. But that was the government's explanation. We didn't know about it. And that's where we had to find the document in the record that showed that they did, to counteract his testimony. So that was basically their argument. But that was why I asked, because they did preserve the shell casings. And as you pointed out in the record, that they knew that there was something going on. To me, that's very curious. It was very curious to us as well, because it would seem, yeah, obviously you'd do the same thing with both. In fact, the gun is going to be the much more significant. And you can't test the shell casings to match to the gun unless you have both, obviously. You can't test the gun for blood if you don't have the gun. So when the judge then just only imposed the order regarding the gun and didn't go further and say, for example, let's impose an adverse inference that this gun doesn't have blood on it, then we'd know most likely this gun didn't fire the fatal shot. I want to turn back briefly to the mandate rule, though, because we were here five years ago. Two of you, I believe, were here five years ago with me. And we had this argument about collateral estoppel. And this court said, well, if the spoliation order changes the evidentiary landscape, the judge has to conduct his own independent review of the evidence. And so the United States is left now before you with this argument that the spoliation of the gun, that they're not challenging before you, the spoliation of the gun doesn't change the evidentiary landscape at all. But it's compared to what? It certainly changes the evidentiary landscape compared to what it would be if the gun were present. Isn't the question whether it changes the evidentiary landscape on which the Utah district judge relied to come to the conclusion that even under the summary judgment standard, you did not have proof that a reasonable jury could buy that Mr. Norton, Officer Norton was basically next to Mr. Murray. But we have to look at what the district court's judgment was, take the pieces of evidence that favored the government and say, is that the district court cited? And then the district court said, well, you don't have nearly enough to overcome that and asked, does any of that change according to whether the gun is now out of the picture? Yeah, I know. I agree with you. I think that's exactly right. Where what we're looking at, though, is that when the court makes a summary judgment decision, it is looking at the evidence that is before it is making a decision based upon that evidence. And here, if you had said to Judge Campbell, this gun that you couldn't deal with without spoliation, this gun the United States spoliated and it didn't have Mr. Murray's blood on it and therefore most likely it didn't fire the fatal shot, would she have reached the same result? We don't know. That's why we need to have the independent evaluation of the evidence. We can no longer just say, well, she found it when she was looking at all this evidence. One of the things she said was, well, Norton's story, besides these other things, Norton's story was supported, corroborated by this independent evidence. She was pointing specifically to, you know, he says that Mr. Murray shot himself in the head with a gun and there was a gun. So, yeah, she did rely on the gun. And that's where I think the United States' argument on that was almost humorous, to say that that summary judgment order didn't rely on the gun. Of course it relied on the gun. It said this is the independent evidence to corroborate the story and you don't have enough to now overcome that. So that's why we just, all we need now is that independent evaluation of that piece, of the evidence with that new knowledge regarding the gun that it can't be used, with the knowledge that the blood evidence either can't, to do something with that blood evidence that should have been dealt with by the judge here. I think I'll reserve the rest of my time. Thank you. Thank you. Ms. Hanson-Young. Good morning, Your Honors. May it please the Court. I'd first like to address a key difference here that is relevant to how this Court resolves the issue of the spoliation findings made by the CFC and the sanction. A failure to collect potentially useful evidence is different than the destruction of evidence that has already been collected. And no Court has held that government law enforcement's failure to collect evidence should result in a spoliation sanction. And that question has been addressed in the Second Circuit, the Sixth Circuit, the Ninth Circuit, and the Tenth Circuit. Well that's always, always, always in the context of criminal trials. Correct? The Second Circuit has addressed it in the context of criminal trials and the CFC's decision in the appendix at 15 to 17 discusses a variety of cases, all of which were addressed in the civil context. In particular, a Tenth Circuit case that looked at whether prison officials should have been sanctioned or spoliated evidence when a prisoner had hung himself and they found him in the act of hanging himself and dying. And the next day they cleaned and repainted his cell and didn't collect any evidence there. And the Tenth Circuit held there that no spoliation sanctions would have been appropriate. But those were fact-specific conclusions, right? Sure. I mean you argue that there's some per se rule that there's no obligation to ever collect evidence even when you should be aware of the potential for litigation. Well what we've argued is that no Court has actually imposed such a rule. And the burden here is on the plaintiffs because they are the ones seeking the spoliation sanctions. My problem with the spoliation sanctions is 15 years on the District Court I saw lots of spoliation issues. Never once have I ever seen a sanction that didn't include a negative inference. I mean that's the fallback, that's the standard. I mean in this case not only was there no negative inference but then the Court did rely on the fact of the gun. So I don't know, I mean I don't even understand how there was a sanction of any sort here in this case. Well I think as was discussed earlier, the sanction was the fact that I think the sort of meat of the sanction if you will was the fact that the government could not rely on the un-injected shell casing to establish that the gun had been Yeah but they still got to rely on the fact of the gun, they got to rely on other aspects and there was no negative inference that the gun would not have shown evidence that would support the government. The government's position here is that a negative inference would have in fact been overly prejudicial to the United States and here's why. So the plaintiffs have argued that testing the gun would have been useful and there's a couple of different tests that could have been Well there's a difference between prejudicial and overly prejudicial. I mean it's the government who destroyed the gun. Sure, but any sanction has to be narrowly tailored to remedy the violation. Here the plaintiffs have not disputed that the government's they have not appealed the CFC's negligence findings so we are stuck with the district court's finding that the government was only negligent in destroying the gun. Didn't act in bad faith. And again, maybe he doesn't get the whole enchilada. Maybe there's no complete order that says you lose but to have no negative inference doesn't make a lot of sense to me. The reason why it doesn't matter, there's two reasons why it doesn't matter. First is that any negative inference is already supported by the that's the negative inference you're talking about. But assume that the plaintiffs The negative inference would be that the gun wouldn't show anything beneficial to the government including blood. And that's fine because the existing evidence even if the CFC had imposed that negative inference it wouldn't have changed the outcome because the existing evidence here is photographic evidence of gun that shows that there was no blood on it. And there was also expert testimony that blowback doesn't uniformly occur in all cases of contact shootings. So it is certainly plausible that the gun was used at point blank range to shoot Mr. Murray and that there would be no blowback. And the plaintiffs here had the photographic evidence of the gun with no blood on it. And they could have relied on that to argue that there was no blood and therefore the gun wasn't used at close range. But I would also point out that the plaintiffs did agree here that the gun was used at close contact meaning it was touching Mr. Murray's head to shoot him. So the existence of gun on the blood or non-existence of gun on the blood isn't relevant. They don't concede that the gun that was destroyed was at his temple. They say a gun was at his temple. They believe it was the officer's gun that was at his temple. So now if you're looking at the question of whether the FBI should have in fact taken possession of Officer Norton's gun and tested Officer Norton's gun to see if there was blood on it which the FBI didn't do, then you get back to the question of was that spoliation in the first place? And the FBI didn't ever collect that evidence or perform that test. So then you get to the question of whether a decision not to collect evidence as part of an investigation into a crime can result in spoliation. Can I just understand? I think I remember from your brief that you make the argument that non-collection of evidence is never a basis for spoliation but that you make a narrower argument that the non-collection in these circumstances was reasonable and you go through a variety of arguments. Do I understand the relationship between those arguments that you don't need the broader categorical proposition for the argument you're making? Yes. This court does not need to issue a blanket ruling that a failure to collect evidence, even if negligent, could not result in spoliation. And how much of the narrower argument did Judge Hertling make to support your view that not collecting Norton's .40 caliber gun was reasonable and not insisting on the autopsy, not doing other things? I don't believe that there were any factual findings made, although I am happy to the extent that the CFC's decision was very thorough, it's certainly possible that there were. But in the discussion specifically on the question whether there was a legally enforceable duty to collect particular evidence, the CFC... Right, but the answer to that question can be sometimes. Unless you have a categorical position that there's never spoliation even for an unreasonable, bad faith non-collection. Well, the CFC didn't make that finding, that categorically there can't be spoliation if there is bad faith. But what the CFC found is that no court had ever applied spoliation sanctions in cases where there's a failure to collect evidence. So the CFC took the position that basically the government is held to a lower standard than any other private civil litigant. Well, I don't think that that's necessarily a fair characterization of the CFC's decision. I mean, if there is a bad faith... The CFC noted that in criminal prosecutions if there's a bad faith failure to preserve evidence that's a constitutional violation, for example. Right, that's a very different question. But I would also say that I think that the distinction that the CFC made depends on the fact that federal law enforcement officers have a lot of discretion when they're investigating a crime. The FBI only has statutory authority to investigate certain crimes. Right, but we're not talking about investigating a crime. We're talking about the question of whether or not there's anticipation of civil litigation and what the standards should be. And so the question is, it may be true that in a criminal prosecution there would be no constitutional violation, but that doesn't mean that no negative inference gets drawn when something as obvious as not testing a body or not testing a weapon occurs. What I would say is that even when presented with that situation with the question of whether law enforcement officers should collect not only evidence of a crime but also evidence that could be used in future civil litigation relating to the same set of facts, no court has imposed such a duty on law enforcement officers. Can I ask two related questions? One is, we had some discussion earlier about what findings there were about the time at which the government reasonably anticipated litigation. Can I maybe get a quick answer to that and then get to the more interesting questions? Sure. At Appendix 18, the CFC does state that the court agreed with the district court judge that there was a reasonable expectation that litigation could result at the time of the death. And then also noted that as of the time the gun was destroyed in December 2008, the FBI should have been on notice. Reasonable anticipation of litigation, does that standard mean for purposes of spoliation that the United States government had to reasonably anticipate litigation against itself or against somebody else? I don't know how familiar the FBI agent Ashdown was with the treaty kinds of claims, whether that's well-known or kind of... And that's what we argued in the CFC, that the FBI didn't have a reasonable expectation of litigation against the United States. The CFC, I believe the CFC didn't address that with respect to the earlier date, the April 2007 date. I do believe that the CFC... Well, what's the law on spoliation generally? Is a litigant charged with... When a litigant pre-litigation has destroyed some evidence, so bringing it into the realm of spoliation, at least at the first step, does that litigant to actually get into the realm of spoliation have to have reasonably anticipated litigation against itself? Or is it enough if that litigant reasonably anticipated litigation against someone else without making the mental connection, this may come back to me? The case law that I have seen on this issue is only the former. That is that a litigant only has the obligation to preserve evidence in litigation that it anticipates against itself, not against a third party. Isn't your problem, though, that when we're talking about the reservation, the only entity with jurisdiction to collect the evidence, to deal with the evidence, is the federal government? And that the federal government at that point is actually standing in the shoes of the state governments because the state governments don't have the authority. They shouldn't have been there in the first place. So we've got all that. So in this case, it's a very different relationship between the FBI and the state jurisdiction than would exist outside of the reservation. Yes, that's right. But even so, no court has imposed a duty on any law enforcement officers, whether they're the ones with the jurisdiction over the investigation or not, to collect evidence for use in subsequent civil litigation. Judge, just to be clear, you're saying that the FBI is held to a lower standard with respect to exfoliation because it's not disputed that the gun was destroyed by the FBI. We're not. We haven't appealed the district court's exfoliation ruling with respect to the gun. What we are saying, because the gun was collected. It was held as evidence in the possession of the FBI. And you went through the forfeiture procedures and didn't tell the district judge somebody else may need this. Correct. Now, I would note along those lines, the plaintiffs also didn't request. The notice was public. The district court found the notice was sufficient. The plaintiffs didn't request it. The state defendants didn't request it either. So apparently nobody thought of the gun. Now, that's sort of neither here nor there because we're not appealing the exfoliation ruling with respect to the gun. But I think your question goes to uncollected evidence. And for evidence that,  they're not looking for any sort of evidence. They're looking for evidence that they think is relevant to the crime. And in Agent Ashdown's opinion, which our experts subsequently testified to as being reasonable, he arrived on the scene. He was told a brief description of events by a supervisory officer. And he observed the scene. He walked to the various elements of the crime scene, the shell casings, where Officer Norton was located, where Mr. Murphy's body was located and the shell casings and the gun there. He set evidence, tags down, took GPS locations, photographed it, and observed Officer Norton, who had no blood on him, and determined that everything he had been told was consistent with Mr. Murray shooting himself. He spoke with other officers at the scene. And so that, again, our expert testified that that was reasonable. And given that law enforcement officers have discretion over what evidence they choose to, or what items they choose to take into evidence, and for the court here to find that a failure to collect evidence could be enforceable through a spoliation sanction would impose a really broad obligation on the part of law enforcement officers to collect all kinds of evidence from every single possible test, even if in their expert opinion the test wouldn't have shown anything, as here the blowback, the existing photographic evidence shows there was no blowback. So the plaintiffs still had that available to them. Does a civil litigant that's not a law enforcement officer have discretion to decide whether or not something's important or not? I would say that the case law does not indicate that a civil litigant does have the discretion. If something is obviously relevant, it would be relevant for evidence. It should have been. But a civil litigant can't choose to decide what's relevant, right? I mean, I think inherently there is some choice, right, in setting something aside or not. And then the question that the court seemed to have grappled with was was it relevant or not. I mean, I think there's always inherently some choice on the part of a civil litigant to decide whether something or not. Whether they should err on over-preserving... So is it your position that when the FBI agent arrives and he's told by the law enforcement officer who's not even supposed to be on the reservation that it was suicide, that he's allowed to accept that at face value and does not have to otherwise collect any evidence? Well, let me just note, I think this is helpful for the court because it is, you know, the state police officers were not supposed to be there. But they have testified, and what is true is that the reservation is in fact in a checkerboard pattern with non-reservation lands. And at the time that they pulled over and chased the suspects on foot, they didn't know what the land was, whether it was federal or state. And they also didn't know that the defendants were members of a tribe. And they only... Or that Mr. Murray was a tribal member. And they only figured that out... 25 miles past the reservation border. Are you saying the state law enforcement officers had no idea where the reservation border was? I mean, we addressed this in the last time that we were here. Sure. There's some absurd things that happened in this case. I'm not disputing that. I'm simply repeating what they said. And I think that's helpful for context. Right, the context is there were 25 miles past the border. My understanding is that the border was still a checkerboard pattern. But regardless, they shouldn't have been there. As you've said, they had no jurisdiction. But even so, the discretion is still within the FBI agent arriving on the scene to observe what he saw and to make investigatory decisions. And he did not observe anything that was inconsistent with a suicide. And... Can I just return to something? I just want to really fully understand this. It seems to me maybe these two questions are related. But it seems to me there's one question whether the FBI agent coming on the scene because at that point he knew that he was on the reservation and there's federal jurisdiction and therefore criminal jurisdiction and state criminal jurisdiction is at least limited, maybe non-existent. And another question, whether the FBI agent coming on the scene also anticipated that the United States might be civilly sued. And you said, I think in passing, that in the CFC you made an argument to the effect that... We did. ...only anticipation of suit against oneself subjects to... subjects what not personally, I mean the institution of the United States, subjects one to a spoliation sanction. What, if any, evidence was there and what, if any, findings have there been in either of the two forums about whether the FBI agent Ashdown anticipated that the United States might be sued? I believe Agent Ashdown testified that he did not anticipate litigation at all. Now, I don't know if his testimony was specific enough to the United States or to the state, just that he didn't anticipate litigation. And I, if it would help your honor, I'm happy to file a very short 28-J letter pointing the court to where we argued, made these arguments, not re-raising these arguments, but where we made these arguments in the CFC, if it would be helpful. But I... I think that... at the time, and again, the CFC's ruling that one litigation was reasonably anticipated wasn't clear as to whether it was anticipated against the United States or the state defendants. The document, the so-called smoking gun document about some FBI knowledge of the state, of the, I guess, not yet formally filed private litigation against the non-Feds, would that involve Agent Ashdown specifically or other persons within the FBI? I... So the author of the report is redacted, but Agent Ashdown had retired by then. And a different agent had taken over, Agent Ryan, I believe. And so at the... And I would also say... But the agents or government attorneys involved in the forfeiture proceeding were the same ones that this doc... or there's some overlap that this document shows were aware of the Utah litigation about to be filed. I... No, the document... It's not two separate hands. No, the... Yeah, right, that's correct. And the document... I'm sorry, what's correct? I said it's not two separate hands? No, no, it is two separate. It... Two separate agencies. The document was a case report authored but within the FBI. I don't... Your question relates to whether the attorneys handling the forfeiture would have known about the case report? Well, the... government representatives or agents, and here I mean small A agents, not big A agents, who were involved in the proceeding that produced the destruction of the gun, the forfeiture proceeding, whether they were the same people who knew something that this document shows about the impending Utah litigation. That I don't know. But what I do know is that... Who made the decision to not conduct the autopsy that the FBI originally requested? That was exclusively the decision of the medical examiner. So the medical examiner, after allowing the state officers to defame the body, then made the decision not to do the autopsy that the FBI said to do? Well, the inappropriate probing of the head wound occurred before the body was delivered to the medical examiner. That occurred the day before... The probing of the head wound and the insertion of the needle into the heart and the slicing of the neck, that all occurred by law enforcement officer before... Before it went to the medical examiner. Before the body went to the medical examiner. But the medical examiner had to have been aware of those things on the body. Yes, and the medical examiner testified that the probing was based on the conclusion that the wound was caused by a close contact gunshot wound because of the... Were any of those officers charged with abusing a corpse? I don't believe they were charged with anything in Utah. Any crime or... And I don't know what the internal investigation procedures were. I believe that this litigation was the only... There was no follow-up. Can I just ask you, I realize this is like starting the second half of the argument, and I apologize for that. Sure. What do you think the relevant comparator is in the phrase about changing the litigation landscape or the evidentiary landscape compared to what? Obviously, it's in some sense a potentially significant change in what the pool of evidence would be if we had the gun. Is that the comparator or is it what evidence was relied on by the Utah district judge in reaching, as affirmed by the 10th Circuit, in reaching the conclusion that no reasonable jury could, comparing the plaintiff's evidence and the defendant's evidence, make a finding that Norton was near Murray when Murray fell? It's the second, Your Honor. Whether there's been a, and whether there's been a change in the evidentiary landscape refers to whether, to the specific question that was before the Utah district court and was then before the CFC. Right, so that if there's a different evidentiary landscape there, it's no preclusive effect. That's correct. And here, So it's not whether or not given the change in evidence you might weigh it differently. It's whether the evidence is different from what the district court had and therefore needed to all be re-weighed. As to the precise issue to which the doctrine of issue preclusion applies. And while I agree that the gun would be, the ability of the United States to rely on the gun might change the evidentiary landscape with respect to the larger question of whether Mr. Murray shot himself, it's not relevant to the, it didn't change the evidentiary landscape with respect to the question of Officer Norton's location. The district court explicitly at page 1191 of its decision relied only on Officer Norton's testimony and Officer Byron's testimony to find that Officer Norton was more than 100 yards away from Mr. Murray. And Officer Byron testified so it wasn't just Officer Norton's self-serving testimony that he was far away and didn't shoot Mr. Murray. It was also Officer Byron who testified that he saw, he was going over rough terrain, he saw Officer Norton on a hill about 400 to 500 yards away from where he was standing. And then he heard crackling, he continued on for, crackling being gunshots, gunshots. He continued on for a brief period, looked up, saw another person who ended up being Mr. Murray about 200 yards from him. So the space between Officer Norton and Mr. Murray was about roughly 200 to 300 yards according to Officer Byron. And he saw Mr. Murray waving his arms and then he heard more crackling noises and saw Mr. Murray fall to the ground. And nobody else was anywhere near Mr. Murray when he fell and when Officer Byron heard the gunshots. So that precludes, I mean that unless, you know, I mean there's no affirmative evidence that places Officer Norton next to Mr. Murray. The plaintiffs have agreed that Mr. Murray died as a result of a close contact gunshot wound. They don't dispute that. That means that somebody had to hold the gun next to Mr. Murray's head with no evidence in the record to support the position that there was anyone near Mr. Murray. The plaintiffs cannot prove that Officer Norton shot Mr. Murray and that's what the District Court found. And Officer Norton's hands were not tested, his clothes were not tested? No, but as the 10th Circuit in affirming the District Court ruling found, Agent Ashdown testified that he did not see any blood on Officer Norton when he arrived on the scene. And no other officers testified to that either. I would also note that as far as other independent evidence that we have, now this was not considered by the District Court so it wouldn't factor in, but just for this own Court's knowledge, the other independent evidence is from the dispatch transcript and our expert testified or submitted a report, I believe it's around Appendix 456 that looked at the dispatch record which said that there was a minute and 55 seconds between the time that Officer Byron saw Detective Norton first on the hill and between when Officer Norton reported that shots were fired and Mr. Murray was on the ground. And that it would not be possible for Officer Norton to run more than 100 yards, shoot Mr. Murray at close range, while at the same time Byron, Officer Byron and Trooper Young are advancing, for neither of those officers to have seen him for Officer Norton to have manipulated the evidence, changed his clothing, planted a gun and then got back. So again, is this, because again, this case is not about who ultimately prevails. This case, at this point, is about what the CFC should have done in considering all of the evidence. Yes. And so, you're basically arguing the evidence that the CFC threw out on summary judgment. Yes, you're right. And I agree that for our purposes, this court doesn't need to look at that evidence. That was simply, there is other corroborating evidence in the record that supports Officer Norton's story and the plaintiffs have argued that the testimony is self-serving and that there's nothing else there, but that is in fact not true. I think what this court should look at is the fact that the Utah District Court relied on Officer Norton's testimony and Officer Byron's testimony. What I don't understand is why, given the remand, given the spoliation, the clear spoliation, why didn't the government avoid going through a summary judgment exercise again and simply say, let's just try this case? If you think the evidence is so good, why didn't you just try the case like the remand implied? Respectfully, Your Honor, the plaintiffs brought, I believe, more than 30 alleged crimes in the CFC. A lot of them, it was not even clear how they were relevant. That goes to motions and limine, not your overall summary judgment for the whole case after we've already been up here. The United States makes litigation decisions. There's not endless resources that the government has to try cases just to flesh out the facts. The United States looked at the evidence that was available and made a determination that on the basis of the issues decided by the district court, specifically Officer Norton's location, that he was more than 100 yards from Mr. Murray at the time Mr. Murray was shot, there is no way that a reasonable jury could conclude that Officer Norton shot Mr. Murray or that he was near him. That factual finding by the district court precludes any grant of summary judgment for the plaintiffs and the CFC. I think to go forward to a trial, a lot of litigants prefer not to go to trial. It's expensive. It's costly. If there's a legitimate way to resolve a case before reaching trial, that should be addressed. Just as the court would generally try to conserve judicial resources. Are you ready? Anything else that you want to ask? Any more questions that you want to ask? Okay. Thank you, Your Honor. We would ask  court affirm the CFC's ruling. Mr. Rasmussen. Thank you. I wanted to start off with the United States discussion of the murder of Officer Byron because this was a dispute that we had in the CFC as to whether there was one witness or two. I'm going to direct you to appendix page 24, the judge's decision. Officer Norton was the only witness to the gunshot that killed Mr. Murray. We had this dispute. Officer Byron five years later said, I saw something, etc. He said he saw Murray fall and Norton wasn't there. There was nobody there when he saw Norton. He said that five years later. This was the discussion we had. You think there is, for summary judgment purposes, a genuine issue of fact about that? Yeah. That's where I think when the judge is deciding this on summary judgment he's saying there was only the one witness. That was Norton. That's what we got here. All that discussion, again, as Judge O'Malley was pointing out, that was the argument we would love to make to the Finder of Facts in this case about these different allegations. Like, oh, he couldn't have possibly run and done this and that sort of stuff. Those are the fact issues that the judge now needs to make an independent determination of because he can't rely on the fire Utah decision. The Utah decision does obviously use the gun. The gun is one of the big pieces of evidence. So you've got Officer Norton saying one thing. Our view is that that's not credible. The judge is saying there's corroboration of it. That included the gun. So we don't have the same evidence. Judge Campbell said one of the reasons I'm rejecting this is because there's this other corroborating evidence, physical evidence. That was what... What exactly was that? That Judge Campbell referred to? My understanding is she was referring to the fact that there was one gun here, one gun there, and there were the shell casings. The shell casings are in existence and the photographs were taken, right? Yes. So that's not missing? No, that's not missing. But what we have, though, is the gun itself was not tested, so we don't have the evidence from that. We don't have the evidence  that. So if we change the evidentiary landscape and say this gun can't be used, or if we change the evidentiary landscape and say the other collected evidence can't be used, then we don't... For collateral estoppel purposes, that's what we're talking about here, for collateral estoppel purposes, we can't say, oh, we can just rely on what she said there, because if she had said, oh, I can't rely on that gun, would she have reached the same conclusion? We don't know. That's why this court in the prior case said if it changes the evidentiary landscape,   know. The United States makes a reference, I hope the court will let me go a little longer since they were able to, the United States references the Trentadue case out of Utah, the CFC cited that case, and I think that's a good example. In that case there was a four-week trial, and so after that, the case is on appeal, and the judges on appeal say, you know, we can't, you know, the standard that we have now at this point, we can't overturn that decision on exfoliation. But that was after a four-week trial, where the judge had all the witnesses come in, did get to evaluate credibility, all those sorts of things. And I think there's several times here where the judge here seems to be more acting like an appellate court judge, so he's saying, citing cases say, well, if I make this decision, it's under discretionary review, those sorts of things, instead of making the decision itself. The other point I wanted to make was really the idea here that the remedy should be dispositive because under some of the case law, it says you gotta have bad faith to have a dispositive sanction. Under the civil case law, the Micron case, for example, this court says, yeah, that's normally the case. Normally, you do have to have bad faith. But when we're looking at a case, we also have for spoliation, we have three factors that we have to look at. And one of them is deterrence, but the other one is how do we try to relevel the playing field? And that's really the problem we've got here, which is the evidence that was destroyed was so important. It was going to be the dispositive evidence one way or the other. The guns were going to be the dispositive evidence. And they were destroyed. I thought Judge Hertling not only found no bad faith, but only negligence and also said you didn't make, I think the language from Micron is something like concrete showing of prejudice, which is to say concrete showing of what it is that there is a plausible reason to expect the evidence to show that would favor you, as opposed to it's possible that there was blood on the gun as opposed to a concrete showing of it, which you would have to show not withstanding the photographs, which I gather don't show that. For the civil litigation that we have, we look at a number of factors. We look at the importance of the evidence. We look at the cause. I thought this prejudice component was where Judge Hertling was trying to figure out how do we get, how do we don't overshoot the, for the remedy to try to get to the remedy. But he at least found that he didn't think he showed that. And that his holding is contrary to the basic law with regard to exfoliation. So, for example, the case out of Puerto Rico with Walmart, not the United States, Walmart made that same argument of, oh, well, you can't show it because we haven't tested it. There could have been blood, for example, in the barrel of the gun. That is a common thing when you have a close contact wound. Blood droplets on the gun. It wasn't tested. So, yeah, you can't show it. And the exfoliation law then deals with that problem and it deals with it by saying, you know, if it's a significant evidence that you can't just get away with saying, well, you can't show what that significant evidence was going to be. If you have something less significant, then you get into more about, well, is there something more concrete you can point to? But when you're talking about something that is the obvious evidence, then you don't have to say, well, if it had been there, here's what it would have shown. You have to show what would be appropriate inferences from the evidence here. So, for example, that Mr. Murray doesn't have any blood on him but the gun doesn't seem to have any blood on it, then Norton's gun, therefore, must have been the gun that did the shooting. That's a reasonable inference. That's the most likely inference from those two facts. So, again, that's why you need to have tested it. Can you just remind me, what's the status of Norton's gun? The 40. No one is able to say where that gun is at this point in time, but if it had blood on it, it was briefly taken by his supervisor. They swapped guns for some reason at the scene, which concerns me. They swapped guns at the scene so that Norton had his chief's gun and then the gun was returned to Norton a couple days later. Unless there are further questions. Any more questions? Okay. Thank you. Thanks to both counsel. In case there's something I missed.  Thank you. Thank you. Thank you. Okay. Thank you.         I have it here. They put it in his jacket. I have it in my jacket. I have it in my jacket. I             have it in my jacket. They put it in me. They said I have it there. They will bring me